## DECLARATION OF SPECIAL AGENT DAVID M. NARWID

1. I am a Special Agent with the Internal Revenue Service, Criminal Investigation (IRSCI). I have worked for the IRS as a Special Agent since August 17, 2006. Prior to that, I worked as a municipal police officer from August 2001 through August 2006 and as an Investigator for the State of New Jersey from December 2000 through August 2001. I have a Bachelor of Science degree in Accounting and Computer Information Systems from Ramapo College of New Jersey. I also have received extensive training in accounting and financial investigative techniques and methods at the Federal Law Enforcement Training Center ("FLETC") in Glynco, Georgia. The training consisted of a two-part program, which included the Criminal Investigator Training Program and the Internal Revenue Service Special Agent Basic Training Program. While attending FLETC, I studied a variety of law enforcement and tax crime issues, including search and seizure, use of search warrants in tax-related investigations, violations of the Internal Revenue Laws and IRS policies and procedures in criminal investigations.

2. The facts and information contained in this declaration are based upon my personal observations as well as information from other agents and officers. All observations not personally made by me were relayed to me by the individuals who made them or they were conveyed to me by my review of records, documents, and other evidence obtained during the course of this investigation.

3. This declaration contains information necessary to support a civil complaint for forfeiture in rem of $305,270.82 turned over to the IRSCI by Linda Bordwine on May 30, 2024 ("the Defendant Property"). I submit that the Defendant Property is property that constitutes proceeds traceable to violations of 18 U.S.C. §§ 1343 and/or 1960, and/or involved in money

laundering in violation of 18 U.S.C. § 1957, and therefore is subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A), (C), and/or (D).

## INITIAL INVESTIGATION AND TURNOVER OF DEFENDANT PROPERTY

4. In early 2024, the IRSCI became aware of suspicious banking activity conducted by Linda Bordwine through a routine review of reportable financial transactions.

5. On February 8, 2024, IRSCI Special Agents Rita Adam and Matt Zimmerman as well as Financial Investigator (FI) Trevor McMurray interviewed Bordwine at her residence. When FI McMurray questioned about her suspicious banking activity, Bordwine immediately acknowledged she knew what FI McMurray was referring to, and that it was probably about when she sent money to a man in Dubai, but the man "did not have the right credentials" and was "asked to send the money back."

6. During the February 8, 2024 interview, Bordwine told investigators that she met the man, who purported to be Larry Jennings, on a dating website, Zoosk, in the fall of 2023. Jennings communicated with Bordwine primarily through text and email and sometimes via phone conversation. They never met in person. Bordwine explained that she became involved with Jennings after the death of her husband because she was lonely. Jennings told Bordwine he lived abroad, worked for an investment company, and wanted to start a car rental business in the United States. In October 2023, Jennings asked Bordwine to help him start the car rental business, and he gave her detailed instructions on how to assist him. Per Jennings's instructions, Bordwine set up a limited liability company named Nemeroff on Legal Zoom using her own money and obtained an Employer Identification Number (EIN) from the IRS. Over the next several months, Bordwine opened bank accounts for Nemeroff at eight different banks—including Citibank, Ally Bank, Wells Fargo, and First Community Bank—per Jennings's instructions and using her own money.

Bordwine explained to investigators that the Nemeroff bank accounts would receive money by either direct wires or checks from other individuals or entities. Upon receipt of those funds, she would receive instructions from Jennings to either send a wire transfer or cashier's check to other individuals or entities or purchase cryptocurrency, such as Kraken and Gemini.

7. During the February 8, 2024 interview, SA Adam explained to Bordwine that there are fraudsters who seek out individuals like Bordwine to help them receive fraud proceeds and launder money. SA Adam gave Bordwine a letter explaining that Bordwine was acting as a money mule and notifying her that any similar activity in the future could result in criminal prosecution. Despite this letter, Bordwine continued to engage in suspicious money transfers up until the end of April 2024, as discussed in more detail below.

8. On May 2, 2024, Bordwine called SA Adam explaining she was going to be receiving an approximately $300,000.00 check from Wells Fargo Bank due to a suspicious activity account closure. She informed SA Adam during this call that she realized she made a mistake by getting into this situation and wanted to assist in the investigation however she could.

9. On May 6, 2024, Supervisory Special Agent (SSA) John Dewire and Special Agent (SA) Justin Motley interviewed Bordwine at her residence. Bordwine explained that Wells Fargo was closing her Nemeroff account because it was under investigation for suspicious activity. As a result of the account closure, Wells Fargo was sending her a certified check for approximately $300,000.00, representing the funds in the closed account. The check was expected to arrive on May 10, 2024. Bordwine said she had not received any monetary gain from the whole scheme. Bordwine stated that none of her personal money was in the Wells Fargo account and disclaimed any ownership of the funds in the Wells Fargo account. She stated was willing to turn over the certified check from Wells Fargo to the IRSCI.

10. On May 15, 2024, Bordwine called SSA Dewire and SA Motley and informed them she received a certified check made out to herself in the amount of $305,270.82 from Wells Fargo Bank. Bordwine reiterated she wanted nothing to do with the check/money, and she was willing to turn over the money to the IRSCI.

11. On May 24, 2024, SSA Dewire, SA Motley, and SA Narwid interviewed Bordwine at her residence. Bordwine informed SSA Dewire and SA Motley that she deposited the Wells Fargo Bank certified check into her personal checking account at First Community Bank (FCB) on May 17, 2024. Bordwine stated she did so because she was afraid of having the check in her home or on her person. Bordwine stated she was still willing to voluntarily turn over and disclaim the money to the IRSCI. After concluding the interview, the agents informed Bordwine they would be in touch about turning over the $305,270.82 to the IRSCI.

12. On May 30, 2024, SA Motley and SA Narwid met with Bordwine at her residence to discuss the turnover of the $305,270.82 to the IRSCI. SA Motley provided Bordwine two forms: Internal Revenue Service Release of Claim and Consent to Voluntary Surrender and Forfeiture. The SAs and Bordwine then traveled separately to FCB located in Marion, VA. Prior to their arrival at FCB, SA Motley notified FCB Branch Manager Jessica Creasy that the IRSCI was investigating a money mule scheme and that they would be visiting with Bordwine for the turnover of $305,270.82 held in Bordwine's FCB checking account. Upon arrival at FCB, Bordwine obtained an official check from FCB made payable to the Department of Treasury - Internal Revenue Service in the amount of $305,270.82. SA Motley then read aloud to Bordwine the two previously provided forms in front of Ms. Creasy. SA Motley then provided Bordwine another opportunity to read the forms herself, which Bordwine did. Bordwine then signed both forms and turned over the official check to SA Motley.

13. SA Motley provided the check to the IRSCI Asset Forfeiture Coordinator. Thereafter, the check was deposited into the Treasury Suspense Account pursuant to IRSCI forfeiture seizure protocols.

## **SOURCE OF THE DEFENDANT PROPERTY**

14. I know from my training and experience that a Business Email Compromise (BEC) scheme is an online crime that exploits the fact that people rely on email to conduct both personal and professional business. In a BEC scam—also known as email account compromise—criminals send an email message, from either a spoofed or compromised email account, that appears to come from a known source making a legitimate request. For example, a company or individual may receive an email request from a "title company" with instructions on how to wire a downpayment, which then goes to the criminal instead of the legitimate company's account. This is often accomplished by a scammer "spoofing" an email account or website by using slight variations on a legitimate address (i.e. john.kelly@examplecompany.com vs. john.kelley@examplecompany.com) to fool victims into thinking fake accounts are authentic.

15. On July 3, 2024, Lincoln National Life Insurance Company (LNLIC) reported a fraudulent wire transfer request to federal authorities. Specifically, LNLIC reported a BEC fraud related to a $1 million life insurance payout.

16. On April 16, 2024, LNLIC received a request from a slightly altered version of a life insurance beneficiary's email address requesting LNLIC wire the funds to a Citibank account. Attached to the email was a "Citibank Account Confirmation Certificate," requesting the wire transfer go to Citibank account number #8685 and provided an address for the beneficiary of "297 cold springs road Chilhowie, VA, 24319." This Citibank account is one of Bordwine's accounts. The Chilhowie address is actually Bordwine's.

17. On April 18, 2024, LNLIC wired $999,975 ($1 million death benefit less a $25 domestic wire fee) to Citibank account #8685.

18. The life insurance beneficiary was not the owner of Citibank account #8685.

19. Bordwine was the owner of Citibank account #8685, as discussed further below.

20. LNLIC has since paid the claim out to the rightful recipient, putting LNLIC at a loss due to the double payment of the policy.

## BORDWINE'S BANK ACCOUNT TRANSACTIONS

21. On April 18, 2024, Bordwine's Nemeroff business account at Citibank (Account #8685) received an incoming wire in the amount of $999,975.00 from LNLIC. Prior to the wire, the account had a balance of $411.46.

22. On April 18, 2024, Bordwine transferred $989,000.00 from the Nemeroff Citibank Account #8685 to her personal account at Citibank (Account #5918), which had a balance of $235.54 prior to the transfer. On April 23, 29, and 30, 2024, Bordwine made two $3,000 transfers and one $2,900 transfer to Jennings via cash app from the Citibank Account #8685 . She also made another $2,000 transfer to her Citibank Account #5918 on April 29, 2024.

23. On April 18, 2024, Bordwine transferred $500,000.00 from Citibank Account #5918 to her personal account at Ally Bank (Account #5385), which had a balance of $77.23 at the time of the transfer. On April 22, 2024, Bordwine transferred another $488,000.00 to her personal account at Ally Bank (Account #5385). On April 30, 2024, she sent Jennings $2,700 from Citibank Account #5918 via cash app.

24. On April 23, 2024, Bordwine transferred $450,000.00 from Ally Bank Account #5385 to her personal account at Wells Fargo Bank (Account #7421). Prior to this transfer, Wells Fargo Bank Account #7421 had a balance of $1,266.46. On April 24, 2024, Bordwine transferred

6

$500,000.00 to her personal account at Wells Fargo Bank (Account #7421). On April 25, 2024, Bordwine made two transfers totaling $36,500.00 to her personal account at Wells Fargo Bank (Account #7421).

25. On April 24, 2024, Bordwine wired $397,345.00 from Wells Fargo Bank (Account #7421) to a Bank of China account in the name of Hebei Hollyland per Jennings's instructions.

26. On April 26, 2024, Bordwine obtained a cashier's check from Wells Fargo Bank Account #7421 made out to Jerry Stock in the amount of $285,000 per Jennings's instructions. She then sent the cashier's check via UPS to an address in Kenai, Alaska, per Jennings's instructions. After doing so, the balance of the Wells Fargo Bank Account #7421 was $305,270.82.

27. On or about May 6, 2024, Wells Fargo notified Bordwine that it was closing her personal account (Account #7421) due to suspicious activity. On May 10, 2024, Bordwine received a certified check from Wells Fargo Bank in the amount of $305,270.82. On May 17, 2024, Bordwine deposited that check into her personal account at First Community Bank (Account #1706) (the Defendant Property). Bordwine then turned over the Defendant Property to the IRSCI on May 30, 2024, as discussed above.

28. Based on the above-described transactions, the genesis of the Defendant Property is the fraudulent April 18, 2024, wire transfer from LNLIC.

## **CONCLUSION**

29. Based on the foregoing information, I believe probable cause exists to forfeit the Defendant Property pursuant to 18 U.S.C. § 981(a)(1)(A) as property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1957. I further believe probable cause exists to forfeit the Defendant Property pursuant to 18 U.S.C. § 981(a)(1)(C) as proceeds from violations

7

of 18 U.S.C. § 1960. Probable cause also exists to forfeit the Defendant Property pursuant to 18 U.S.C. § 981(a)(1)(D) as proceeds of violations of 18 U.S.C. § 1343.


_/s/ David M. Narwid_
David M. Narwid
IRSCI Special Agent